**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

In re:                                                    Chapter 7

MICHAEL HARTIGAN,                                         Case No. 13-14612-AJC

      Debtor.

_____/

MICHAEL L. WEISER,                                        Adversary No._____

      Plaintiff,
v.

MICHAEL D. HARTIGAN,

      Defendant.

_____/

**ADVERSARY COMPLAINT FOR NONDISCHARGEABILITY OF DEBT PURSUANT**
**TO 11 U.S.C. §§ 523(a)(2)(A); (a)(4) and (a)(6)**

      Plaintiff, Michael L. Weiser ("Weiser" or "Plaintiff") by and through his undersigned attorneys, presents this Complaint against the Debtor/Defendant, MICHAEL D. HARTIGAN ("Hartigan") as follows:

**PARTIES, JURISDICTION AND VENUE**

      1.    Plaintiff Weiser is an adult individual residing in Metairie, Louisiana and is indentified by Hartigan as a creditor on Schedule F docketed in the underlying bankruptcy proceedings (Bkcy. Doc. 9).

      2.    Hartigan is an adult individual, a practicing attorney admitted to the bar of the Commonwealth of Massachusetts, and who purports in these bankruptcy proceedings to reside in

Miami, Florida.

3.      Venue is proper in this Court under 28 USC Section 1409 as it is the venue of the underlying bankruptcy proceedings initiated by Hartigan's petition. These proceedings are "core proceedings" pursuant to 28 USC Section 157(b)(2)(O) as they will adjust the debtor/creditor relationship of the parties, Section 157(i) for determination as to the dischargeability of particular debts and under Rule 7001(1) of the Federal Rules of Bankruptcy Procedure.

## **FACTS COMMON TO ALL CLAIMS FOR RELIEF**

4.      In 2003, John E. Rogers, ("Rogers") a tax attorney practicing at Seyfarth Shaw, LLP conceived and devised ineffective and illicit tax shelters designed to enable wealthy, high-income U.S. taxpayers to improperly offset their U.S. tax obligations.  The tax shelters were of two different but substantively similar types.  The first version was the Distressed Asset Debt tax shelter ("DAD Tax Shelter") utilizing multiple limited liability companies, taxed as partnerships, whose ultimate beneficial interests would be acquired by the ultimate taxpayer. The second version was the Distressed Asset Trust tax shelter ("DAT Tax Shelter") (the DAD Tax Shelter and DAT Tax Shelters, collectively, referred to as the "Tax Shelters"), whose mechanics were the same except Illinois business trusts were used in place of the limited liability companies used in the DAD Tax Shelters.  Both versions of the Tax Shelters traded on distressed Brazilian consumer debt having a high original basis value but little or no current market value.

5.      Hartigan promoted the DAD/DAT Tax Shelters to his clients, including Plaintiff, in the context of a purported *investment* strategy for a foreign debt collection business.  Hartigan also represented that the Tax Shelters would have the short term benefit of allowing Plaintiff to lawfully reduce income taxes by claiming loss deductions arising from the transaction and that the debt collection business also had viable economic substance and business purpose. This,

however, was only a pretext. Given his self-proclaimed background in and  knowledge of complex commercial tax-related transactions, Hartigan could never have intended or had any expectation that the pretextual foreign debt collection *investment* strategy would yield any profit or positive return but, instead was nothing but a tax reduction stratagem.

6.      Hartigan was recruited by Rogers and his law firm, Seyfarth Shaw, LLP, ("Seyfarth") a very large, prestigious and sophisticated multi-national law firm, to promote and market the Tax Shelters because Hartigan was believed to have had a book of high net worth clients who may possibly be desirous of seeking tax reduction plans.

7.      Hartigan, from time to time, initiated and/or participated in personal meetings with Plaintiff and conducted many telephone conferences with Plaintiff and exchanged emails with Plaintiff to sell investments in the DAD/DAT Tax Shelters. Hartigan also provided Plaintiff with due diligence materials both in person and through the mail.

8.      Hartigan charged significant fees to his Tax Shelter clients. For example, under Hartigan's October 12, 2004 engagement letter with Plaintiff, Weiser paid a $100,000.00 "documentation and set up fee" and a "Fixed Fee" of $400,000.00.  *See* Hartigan Engagement Letter, attached hereto and incorporated herein by this reference as Exhibit A.

9.      In total Hartigan collected five hundred thousand dollars ($600,000) from Plaintiff  in fees and portfolio purchase price in connection with the 2004 DAD Tax Shelters. Hartigan also collected eight hundred thirty two thousand five hundred dollars ($832,500) from Plaintiff in connection with investments in the illicit Tax Shelters for years 2005, 2006, and 2007.  In total, Hartigan collected one million three hundred thirty two thousand five hundred dollars ($1,332,500.00) from Plaintiff between 2004 and 2007 in connection to the DAD/DAT Tax Shelters.

**Example of a DAD Tax Shelter Transaction**

10.     In operation, the DAD Tax Shelters rely upon a series of complex steps that include a U.S. taxpayer purchasing an interest in a limited liability company whose sole asset is a pool of distressed Brazilian consumer debt. Shortly after the purchase, the bulk of the asset/debt is declared partially worthless thus creating a bad debt loss. Hartigan's sales pitch was materially false and deceptive representing that a substantial bad debt loss would accrue to the U.S. taxpayer, who could then use the loss to offset and reduce taxable income under Section 166 of the Internal Revenue Code.

11.     The purchase price and fees paid by U.S. taxpayer clients to Hartigan to purchase the debt were in amounts that were a small fraction of the face value of the debt comprising the pool at the time of its purchase, in the range of approximately five percent (5%) of the debt pool's face value.

12.     The supposed tax loss was based on a subsequent charge-off or write-off of the face value of the debt pool, not the pool's purchase price or actual value. Thus, on a hypothetical debt pool having a face value of US $1,000,000.00 purchased by a U.S. taxpayer client for US $50,000.00, the write-off of the "partially worthless" DAD pool generated a claimed tax loss of nearly US $1,000,000.00.

**The Seyfarth Opinion Letter**

13.     Hartigan traded heavily on a prefabricated and canned legal opinion letter, issued by Seyfarth and primarily authored by Rogers (the "Opinion Letter"), discussing the Tax Shelters and relevant law,  to lure clients, including, Plaintiff, to invest in the Tax Shelter schemes, falsely describing the Opinion Letter as "independent."

14.     Hartigan presented the Opinion Letter as supposedly demonstrating the level of

due diligence that had gone into making the Tax Shelter investment strategy a viable tax compliant program.  Hartigan represented that the Opinion Letter protected investors and the investment in the Tax Shelters from the Internal Revenue Service by vouching for the Tax Shelter's effectiveness and legality.

15.     The representations made by Hartigan to Plaintiff were materially false, misleading and fraudulent. Among other misrepresentations or failure to disclose, Hartigan did not inform Plaintiff the creator of the Tax Shelter, Rogers, was a partner in Seyfarth, the supposedly independent legal experts vouching for the program and the fact that Rogers himself was the principal author of the Opinion Letter.  Hartigan knew, but purposely withheld from Plaintiff, that the roles of Rogers and Seyfarth in creating the Tax Shelters while also supposedly vouching for the Tax Shelters in the Opinion Letter would strip the letter of its "independence" and under Internal Revenue Service policies and procedures, deprive a taxpayer of a "reasonable cause" defense to mitigate penalties in the event of any disallowance of losses claimed by a taxpayer on federal tax returns related to the Tax Shelters.

16.     Hartigan also concealed the fact that Rogers and Seyfarth directed Hartigan's activities and therefore that Hartigan's legal advice was not his own independent advice.

17.     Hartigan knew that the use of the Seyfarth Opinion Letter would materially mislead Plaintiff into believing the Tax Shelter would effectively and legitimately provide a reduction in his income tax liability concurrent with the program's supposed business opportunity.

**The Structure of the Tax Shelter**

18.     The cornerstone of the Tax Shelter in which Plaintiff invested was Sugarloaf Fund, LLC (F/K/A Warwick Fund, LLC) ("Sugarloaf"), an entity formed by Rogers to acquire

portfolios of distressed accounts receivable from Brazilian retail businesses.

19.    The original version of Tax Shelters used a complex series of transactions, the sole true purpose of which Hartigan knew was to create a scenario for tax losses, but was represented by him to Plaintiff as being engaged in legitimate business operations. The transactions involved:

> (i)    Sugarloaf acquiring a portfolio of distressed Brazilian debt ("Debt");

> (ii)    the formation of limited liability company ("LLC1") to acquire the Debt from Sugarloaf in exchange for Sugarloaf acquiring a ninety-nine percent (99%) interest in LLC1;

> (iii)    the formation of a second entity limited liability company ("LLC2") to acquire a ninety-eight percent (98%) of Sugarloaf's interest in LLC1 in exchange for Sugarloaf acquiring a ninety-nine percent (99%) interest LLC2; and

> (iv)    Sugarloaf selling its interest in LLC2 to the investor/client.

20.    The Tax Shelter sold by Hartigan in 2004 employed the above described structure.

21.    In October, 2004, Plaintiff paid $200,000 for LLC2.  In addition, Plaintiff was required to enter into a Subscription Agreement for Additional Membership Interest in LLC2 in which Plaintiff agreed to pay an additional US $3,800,000.00 on or before December 31, 2004 as evidenced by a Promissory Note dated as of December 31, 2004 made payable to LLC2. Hartigan knew or should have known that, because Plaintiff was never at risk of being called on the Note, the Note would be disregarded by the IRS in any examination of the Tax Shelters.

22.    Hartigan materially and misleadingly represented to Plaintiff that (i) the pool of

6

debt held by LLC1 would be declared partially worthless and would, therefore, create a viable tax deduction equal to the DAD pool's face amount, (ii) the Promissory Note would be treated the same as if Plaintiff had contributed cash to LLC2 and that (iii) Seyfarth would provide all legal and tax advice, and draft and prepare all documents to effectuate and memorialize Plaintiff's investment in the Hartigan' 2004 DAD tax shelter so as to render all claimed loss deductions proper and tax compliant.

23.    The advice given to Plaintiff by Hartigan was materially false and fraudulent because Hartigan knew that Congress amended the American Jobs Creation Act of 2004 ("AJCA") in October 2004 and Internal Revenue Code §§ 704 and 734, that effectively stripped the DAD transaction from its primary feature creating the sought after tax benefits, i.e., restricting the ability of a foreign partner that "contributed" a high basis, low value asset to a supposed partnership so as to enable the other partners to take advantage of the distressed asset's high basis value.

### THE DAT TAX SHELTER:  AN ATTEMPT TO CIRCUMVENT THE AJCA

24.    After Congress' passage of the AJCA extinguished the DAD Tax Shelter's ability to limited liability companies claiming partnership status, Rogers and Seyfarth devised a new tax shelter (distressed asset trust or DAT Tax Shelter) making use of Illinois business trusts instead of limited liability companies in the use of foreign distressed debt to offset U.S. taxpayer tax liability.   Hartigan seamlessly marketed the new trust tax shelter to his clients, including Plaintiff.

25.    The DAT Tax Shelter was substantively similar to the DAD Tax Shelter differing only in its mechanics.  The DAT Tax Shelters were nothing more than invalid DAD Tax Shelters dressed up in a trust structure and did nothing to address the fundamental defects of the DAD

Tax Shelter.

26.    Once again, Hartigan knew that Seyfarth willfully provided legal and tax advice via an opinion letter to parties on both sides of the ethical street in DAT Tax Shelter transactions (e.g., the Rogers controlled entity, Sugarloaf) on one hand and the trusts established for Hartigan's clients, such as Plaintiff on the other hand, disregarding conflict and full disclosure, drafted and prepared all documents to effectuate and memorialize the DAT Tax Shelters in which these parties were an integral part.

### Hartigan's Promotion of the DAT Tax Shelter

27.    Hartigan used a prefabricated Seyfarth opinion letter entitled Sugarloaf Fund Analysis ("2nd Seyfarth Opinion") that Hartigan materially, misleadingly and fraudulently led Plaintiff into believing validated the DAT Tax Shelter.

28.    Once again, the true roles and relationship of Hartigan, Rogers and Seyfarth were concealed by Hartigan.  Accordingly, Hartigan misrepresented to Plaintiff that the effectiveness of the 2nd Seyfarth Opinion approving the DAT Tax Shelters was the independent and neutral work of Seyfarth.

29.    Hartigan again represented to Plaintiff that the trusts would allow an offset to ordinary income and lawfully reduce income tax and had viable economic substance and business purpose (i.e. foreign debt collection business) in addition to being a legitimate tax reduction investment strategy.

30.    Plaintiff detrimentally relied on these material and fraudulent misrepresentations and omissions with respect to the effectiveness, legitimacy and legality of the DAT Tax Shelter and the viability of the debt collection business.

### The DAT Tax Shelter

31.     In December 2005, Sugarloaf contributed a pool of *foreign distressed debt* that Hartigan knew falsely, misleadingly and fraudulently declared that Sugarloaf's basis "for United States federal income tax purposes in the Debt Portfolio was approximately One Million Two Hundred Fifty Thousand United States Dollars (US $1,250,000.00)."

32.     Consistent with the DAT Tax Shelter's scheme, trusts were created for each investor and for each year of investment.  Plaintiff was directed by Hartigan to subscribe to and purchase one-hundred percent (100%) of the beneficial interest of the 2005 tax year trust created by Rogers as Plaintiff's supposed investment vehicle.  Each Trust ("Main Trust") was coupled with a sub-trust, whose purpose was only to serve as a vehicle beneficially owned by Plaintiff and which would receive from the Main Trust the debt portfolio's high basis amount.  That high basis would then be used as grounds for calculating personal tax losses.  As a result of these transactions Plaintiff owned the beneficial interest in both the Plaintiff's 2005 Trust and the related Sub-Trust.

33.     Prior to the end of the 2005 tax year, Seyfarth and Rogers made a declaration of partial worthlessness with respect to the *foreign debt contributed* to the Plaintiff 2005 Trust and provided Plaintiff a Form 1041 U.S. Income Tax Return for Estates and Trusts for the 2005 Sub-trust that reported Plaintiff's losses from the *foreign distressed debt* as $1,212,500.

34.     Plaintiff prepared and filed his 2005 tax return reporting the purported losses.

35.     Subsequently, Hartigan persuaded Plaintiff to invest in the fraudulent, ineffective and illicit DAT Tax Shelter for the 2006 and 2007 tax years by following the same and/or similar procedures it used in promoting the 2005 DAT Tax Shelter and by using DAT Tax Shelter Documents dated for the 2006 and 2007 tax years, respectively.  As he was in the 2005 Trust, Rogers was the Trustee for the 2006 Trust and the 2007 Trust.

36.     The process was repeated for the 2006 and 2007 tax years.  Plaintiff was provided a Form 1041 U.S. Income Tax Return for Estates and Trusts for the 2006 Sub-Trust that reported Plaintiff's losses as $2,619,000 and, in reliance thereon, prepared and filed his 2006 tax return reporting the losses.

37.     Plaintiff was provided a Form 1041 U.S. Income Tax Return for Estates and Trusts for the 2007 Sub-trust that reported Plaintiff's losses as $1,940,000 and in reliance thereon, prepared and filed his 2007 tax return reporting the losses.

**DAT Failure and Fees**

38.     On information and belief, Hartigan collected eight hundred thirty two thousand five hundred dollars ($832,500.00) in fees from Plaintiff in connection with investments in the illicit DAT Tax Shelter for years 2005, 2006, and 2007. Hartigan shared a portion of these funds with Seyfarth and Rogers in amounts unknown to Plaintiff nor disclosed to him by Hartigan.

39.     The DAT Tax Shelters could not provide the tax benefits Hartigan promised and has been declared by the IRS as a "tax avoidance transaction" as was the similarly flawed DAD Tax Shelter.

40.     Despite Hartigan's representations regarding the Tax Shelter's reliability Hartigan (a) failed to produce to Plaintiff the relevant records to substantiate validity of related tax losses that he advised Plaintiff to take; (b) failed to maintain the relevant records; or (c) concealed the fact that relevant records never existed.  Regardless, Hartigan's conduct in failing to prepare, maintain or retain the necessary trust documents and other documents substantiating the bad debt losses is improper and has caused the IRS to not only deny Plaintiff's DAT based income tax deductions for 2005, 2006, and 2007, but to impose tax penalties for these same tax periods.

41.     As to both the DAD and DAT Tax Shelters, the IRS determined that (i) taxpayer

could not provide documentary proof of the basis of the contributing party had in the debt at the time it was contributed; (ii) the taxpayer could not provide documentary proof of the basis the US taxpayer had in the debt at the time that taxpayer acquired it; (iii) lack of documentation that the debt became partially worthless within the taxable year that the loss was claimed; (iv) the failure to establish that the built-in losses on disposition of the debt should not be disallowed under anti-abuse rules; (v) failure to establish that the partnerships or trusts were formed for purposes other than to transfer tax losses in violation of the economic substance doctrine and substance over form doctrine for the "sham" partnership doctrine; (vi) that the purported partners had insufficient business motive in the underlying participating business entities; (vii) failure to provide proof that promoter and legal fees were deductible; and (viii) that gross misstatement valuation or gross understatement of tax penalty should not apply.

42.     Given his status as a tax professional and involvement in the structure, formation and implementation of the Tax Shelters, Hartigan knew or should have known and failed to disclose to Plaintiff that:

(i)      documentation was lacking that would allow any taxpayer, including Plaintiff, to satisfy any of the factors identified in Coordinated Issue Papers, during the time periods that Hartigan provided information to Plaintiff, issued by the Internal Revenue Service and discussing the reasons losses incurred in debt transactions may not qualify as bona fide tax deductions, all of which merely involve restatement of long-standing tax policy;

(ii)     the basis in the Debt at the time it was acquired by Sugarloaf was insufficient to justify the claimed carry over basis upon which tax

losses were claimed;

(iii)    that the Debt did not become partially worthless within the tax year the losses were claimed;

(iv)    Treasury Regulation 1-701-2(a) would cause the built-in losses upon the disposition of the Debt to be disallowed or reallocated that where the underlying business transaction lacks economic substance independent of generation of tax losses and the transfer of a foreign asset into United States has no business purposes other than to create tax losses and otherwise is not securitized, bad debts claimed in connection with those losses would be disallowed;

(v)    that the reasonable likelihood that the gross revenue from the purported debt collection business would be a pittance compared to claimed tax losses thereby triggering the "anti-abuse" provision of subchapter K of the Internal Revenue Code, disallowing the losses;

(vi)    the underlying business activity lacked substance precluding any reasonable expectation of profit, thereby disallowing all claimed losses under the IRS' "economic substance doctrine;"

(vii)    that the so called "debt collection business investment" required active participation of all partners, the absence of which generated the "sham partnership doctrine" thereby precluding losses for taxes.

43.    Accordingly, Hartigan knew or as a self-proclaimed complex commercial transaction and tax attorney should have known that:

(i)     Plaintiff would not be able to deduct promoter and legal fees on his

tax return; and

(ii)    the disallowance of the losses would trigger penalties under

Internal Revenue Code Sections 6662(b)(1) generally for failure to

comply with the provisions of the Code, 6662(a) and (b)(2)

imposing penalties for underpayment arising from gross

understatement of income and Section 6662(e)(2) imposing

penalties for gross understatement of tax liability.

44.     As a result of the fundamental invalidity of both the DAD and DAT Tax Shelters,
the IRS disallowed all tax deductions claimed by Plaintiff from his investment in both the DAD
and DAT Tax Shelters for years 2004 through 2007 and has resulted in the assessment against
Plaintiff of substantial interest on unpaid or underpaid taxes and substantial penalties for gross
understatement of taxes and underreporting of income.

45.     Further, Hartigan knew that the promissory notes executed by Plaintiff as
supposedly providing basis upon which tax losses may be claimed were illusory and did not
place Plaintiff "at risk" for the amounts of those notes, thereby rendering those notes as invalid
and of no effect as a basis for calculating tax losses.

**Hartigan Owed Plaintiff a Fiduciary Duty**

46.     Hartigan owed Plaintiff the duties of honesty, loyalty and care in providing him
with professional legal and tax services and advice regarding the foreign debt collection business
and related income tax strategies.

47.     Hartigan had a duty to use his superior individual and institutional knowledge and
experience regarding international tax matters and the structure of the Brazilian debt collection

business to advise Plaintiff of the flawed tax reduction strategy upon which the Tax Shelters were based but, instead, misrepresented these features so as to induce Plaintiff to invest with the purpose of generating high fees to Hartigan.  Hartigan failed to provide Plaintiff with accurate information regarding Tax Shelters but, instead, actively worked to deceive Plaintiff into believing that the Tax Shelters had been vouched for as viable and tax compliant by a major multinational law firm, that Sugarloaf had realistic business purposes in conducting the debt collection business even though Hartigan knew that virtually the entire portfolio of accounts receivable would be written off as worthless almost immediately upon its acquisition by Sugarloaf, was predicated upon a series of unduly complex (and in the context of a meaningful business, wholly unnecessary) procedural steps that would violate IRS regulations and policies, involve transactions where fundamental underlying documentation was lacking to support the claimed values of such transactions and otherwise was so structurally flawed that the Sugarloaf Tax Shelters had no prospect of ultimately being regarded by the IRS as tax compliant.

48.    Hartigan had a duty to disclose conflicts of interest in his representation of Plaintiff.

49.    Hartigan breached his duty to disclose conflicts of interest by failing to disclose to Plaintiff that he also represented entities with whom Plaintiff contracted as part of his DAD/DAT Tax Shelter transactions.

50.    Hartigan had a duty to act in the best interest of Plaintiff in his representation of Plaintiff.

## HARTIGAN'S FRAUDULENT CONDUCT

51.    At all times relevant to the conduct complained of in this Complaint, Hartigan directly and indirectly made numerous knowingly false affirmative misrepresentations and

intentional omissions of material fact to Weiser, including but not limited to:

(1) On or about May, 2004, Hartigan told Weiser to engage in illegal and abusive tax shelters, the DAD/DAT Tax Shelters, during in person meetings in New Orleans, Louisiana;

(2) On or about May, 2004 through 2007, Hartigan told Weiser on the telephone and in emails to engage in illegal and abusive tax shelters, the DAD/DAT Tax Shelters;

(3) Hartigan, in person in May, 2004, and on the telephone and via email from May, 2004 through 2007, told Weiser that the DAD/DAT Tax Shelters were effective legal income tax-reducing investment strategies;

(4) Failing to advise Weiser that the DAD/DAT Tax Shelters were illegal and abusive tax shelters;

(5) Failing to disclose the actual roles and relationships of Rogers, Seyfarth, and Hartigan (e.g., the conspiracy) in the DAD/DAT Tax Shelters;

(6) Failing to disclose that he was splitting and/or sharing fees with Seyfarth and Rogers with respect to the DAD/DAT Tax Shelters;

(7) Failing to disclose to Weiser that Hartigan had undisclosed fee-kickback agreements with Seyfarth and Rogers with respect to the DAD/DAT Tax Shelters;

(8) Hartigan in person in May, 2004, and on the telephone and via email from May, 2004 through 2007, told Weiser that the Seyfarth Opinion Letters were "independent" legal opinions from an "independent" law firm;

(9) Hartigan, in person in May, 2004, and on the telephone and via email from May, 2004 through 2007, told Weiser that the Seyfarth Opinion Letters could be relied upon by Weiser to protect him from incurring penalties if audited;

(10) Hartigan, in person in May, 2004, and on the telephone and via email from May, 2004 through 2007, told Weiser that the Seyfarth Opinion Letters could be relied upon to satisfy the IRS as to the effectiveness and propriety of the DAD/DAT Tax Shelters if audited;

(11) Hartigan, in person in May, 2004, and on the telephone and via email from May, 2004 through 2007, told Weiser that the DAD/DAT Tax Shelters would more likely than not be upheld as legal tax-reducing investment strategies if audited;

(12) Failing to advise Weiser that the IRS would more likely than not conclude the DAD/DAT Tax Shelters were illegal and abusive tax shelters if they were audited;

(13) Hartigan, in person in May, 2004, and on the telephone and via email from May, 2004 through 2007, falsely told Weiser that there was a reasonable likelihood of making a profit on the "investment" component of the DAD/DAT Tax Shelters;

(14) Designing, marketing, selling, and implementing illegal and abusive tax shelters that the IRS would disallow, such as the DAD/DAT Tax Shelters;

(15) Failing to advise Weiser that Seyfarth had already prepared "canned" and "prefabricated form" legal opinion letters approving the respective DAD/DAT Tax Shelters and needed to only fill in several blanks for each of the many clients to which they rendered such opinion letters;

(16) Illegally promoting and selling unregistered tax shelters by promoting and selling the DAD/DAT Tax Shelters to Weiser;

(17) Failing to disclose to Weiser that if he filed tax returns using the DAD/DAT Tax Shelters he would more than likely be liable for penalties and interest;

(18) Hartigan, in person in May, 2004, and on the telephone and via email from May, 2004 through 2007, told Weiser that if he filed tax returns using the DAD/DAT Tax Shelters he could not, would not, and/or should not be liable for penalties and/or interest;

(19) Hartigan, in person in May, 2004, and on the telephone and via email from May, 2004 through 2007, told Weiser that the DAD/DAT Tax Shelters were legal, legitimate, proper, and in accordance with all applicable tax laws, rules, regulations, common law doctrines, and court decisions;

(20) Failing to advise Weiser that the DAD/DAT Tax Shelters were not legal, legitimate, proper and in accordance with all applicable tax laws, rules, regulations, common law doctrines, and court decisions;

(21) Hartigan, in person in May, 2004, and on the telephone and via email from May, 2004 through 2007, told Weiser that the DAD/DAT Tax Shelters had the required economic substance and business purpose for legal tax-reducing investment strategies;

(22) Failing to advise Weiser that the DAD/DAT Tax Shelters lacked the required business purpose for legal tax-reducing investment strategies;

(23) Failing to advise Weiser that the DAD/DAT Tax Shelters lacked the required economic substance for legal tax-reducing strategies;

(24) Making, endorsing, ratifying, and/or affirming the fraudulent statements and representations in the opinion letters authored and signed under the Seyfarth brand (letterhead);

(25) Failing to fully and properly inform and advise Weiser of the American Jobs Creation Act of 2004 and its actual implications on the DAD/DAT Tax Shelters;

(26) Failing to advise Weiser that IRS Notice 2008-34 identified transactions like the DAD/DAT Tax Shelters as "tax avoidance" transactions and as a "listed transaction" and

indicated that the IRS would disallow any reduction in taxes generated through such transactions and expose Weiser to the assessment of penalties for using the DAD/DAT Tax Shelters on their tax returns thereby precluding Weiser from filing amended returns in order to avoid or mitigate potential penalties or accrual of interest;

(27) Failing to advise Weiser that the American Jobs Creation Act of 2004 and IRS Notice 2008-34 applied to the DAD/DAT Tax Shelters and/or impacted the propriety of the DAD/DAT Tax Shelters thereby precluding Weiser from filing amended returns in order to avoid or mitigate potential penalties or accrual of interest;

(28) Failing to revise, alter, amend, or modify the advice, recommendations, instructions, opinions, and representations made to Weiser, orally or in opinion letters, regarding the propriety of the DAD/DAT Tax Shelters in light of the American Jobs Creation Act of 2004 and IRS Notice 2008-34 thereby precluding Weiser from filing amended returns in order to avoid or mitigate potential penalties or accrual of interest;

(29) Telling, instructing, and assisting in the preparation of Weiser's tax returns, which utilized the losses generated by illegal and abusive tax shelters, the DAD/DAT Tax Shelters;

(30) Hartigan, in person in May, 2004, and on the telephone and via email from May, 2004 through 2007, told Weiser to sign and file the tax returns using the losses generated from the DAD/DAT Tax Shelters;

(31) Failing to advise Weiser not to use the losses and purported deductions generated from the DAD/DAT Tax Shelters on Weiser's tax returns;

(32) Telling, confirming, and/or ratifying that the opinions and conclusions in the Seyfarth Opinion Letters were accurate and correct;

(33) Hartigan, in person in May, 2004, and on the telephone and via email from May, 2004 through 2007, told Weiser that their tax returns, which utilized the DAD/DAT Tax Shelters, were prepared in accordance with professional standards and pursuant to IRS guidelines and established legal authorities;

(34) Failing to disclose existing published authority, including the applicable sections of the tax code, rules, and regulations, IRS Notices, and common law doctrines and published court decisions, that indicated that the purported tax consequences for transactions such as the DAD/DAT Tax Shelters were ineffective, improper and not allowable for federal income tax purposes;

(35) Failing to advise Weiser that the DAD/DAT Tax Shelters did not comply with the applicable tax laws, rules, regulations, common law doctrines, and published court decisions;

(36) Hartigan, in person in May, 2004, and on the telephone and via email from May, 2004 through 2007, told Weiser that the DAD/DAT Tax Shelters complied with the applicable tax laws, rules, regulations, common law doctrines, and published court decisions;

(37) Hartigan, in person in May, 2004, and on the telephone and via email from May, 2004 through 2007, told Weiser that the step transaction, sham transaction, business purpose and economic substance doctrines and the partnership anti-abuse regulations would not apply to disallow the results of the DAD/DAT Tax Shelters;

(38) Failing to advise Weiser that the step transaction, sham transaction, business purpose, and economic substance doctrines, and the partnership anti-abuse regulations would apply to disallow the results of the DAD/DAT Tax Shelters;

(39) Hartigan, in person in May, 2004, and on the telephone and via email from May, 2004 through 2007, told Weiser that each of the various steps of the DAD/DAT Tax Shelters were meaningful and imbued with the requisite non-tax considerations;

(40) Informing Weiser that the DAD/DAT Tax Shelters were not "sham transactions" that would be ignored or disallowed for tax purposes;

(41) Recommending, instructing, and telling Weiser to make investments as part of the DAD/DAT Tax Shelters;

(42) Telling, recommending, instructing, and assisting Weiser in entering into transactions that, unbeknownst to Weiser but known by Hartigan were ineffective, illegal and improper and would be disallowed and held invalid by the IRS on multiple grounds, including the transactions lacked the required economic substance and business purpose, were "sham transactions," and violated the step transaction, sham transaction, and economic substance doctrines and the partnership anti-abuse regulations;

(43) Failing to advise Weiser to file qualified amended returns;

(44) Hartigan in person in May, 2004, and on the telephone and via email from May, 2004 through 2007, told Weiser that the IRS would not, and could not, assess Weiser with penalties and interest because of Weiser's proper reliance on the Seyfarth Opinion Letters.


**<u>FRAUDULENT CONCEALMENT</u>**

52.    At all times relevant to this action, Hartigan fraudulently concealed the wrongful acts and omissions set forth in this Complaint by remaining silent and making misrepresentations about the wrongful conduct despite having a duty to inform Plaintiff of such wrongful acts and omissions. Plaintiff reasonably relied on the silence and misrepresentations of Hartigan to his

detriment regarding the following material facts:

a) that Rogers wrote the Seyfarth Opinion Letter, and also designed and created the DAD/DAT Tax Shelters and the corporate and trust entities used to implement the tax shelters, and also owned an equity interest in the entities used to implement the DAD/DAT Tax Shelters.

b) that conflicts of interest that existed between Hartigan, Sugarloaf, Seyfarth and Rogers in the Tax Shelter investments and transactions.

c) that the Seyfarth Opinion Letter misrepresented to Plaintiff that substantial bad debt losses would accrue to him through his investment in the DAD/DAT Tax Shelters and allow him to offset and reduce taxable income under Section 166 of the Internal Revenue Code.

d) that in October, 2004 Congress passed the American Jobs Creation Act expressly annulling and invalidating DAD tax shelter investments.

e) that on February 27, 2008, the Internal Revenue Service released Notice 2008-34 that declared the transaction referred to as a *distressed asset trust* (DAT transaction) a "tax avoidance transaction" and as a "listed transaction".

f) that as of October 22, 2004 the Internal Revenue Service treated DAT transactions as "listed transaction" under § 1.6011-4(b)(2) of the Income Tax Regulations.

g) that in a Coordinated Issue Paper effective March 23, 2010 regarding Distressed Asset Trust (DAT) transactions, the Internal Revenue Service set forth reasons that disqualified claimed deductions arising from a DAT tax shelter.

h) that distressed Brazilian consumer debt records to substantiate the validity of related tax losses they advised Plaintiff to take were not maintained causing his claimed income deductions to be denied.

i) that distressed Brazilian consumer debt records to substantiate the validity of related tax losses never existed.

j) that trust documents required by the Internal Revenue Service to substantiate had not properly been prepared, maintained or retained, causing the Internal Revenue Service to not only deny Plaintiff's DAD based income tax deductions for 2005, 2006, and 2007, but to impose tax penalties for these same tax periods.

k) that the basis in the debt acquired from Brazilian companies by Sugarloaf in the DAD and DAT transactions was insufficient to justify the amount of Plaintiff's carryover/transferred basis (per Treasury Regulation 723)..

l) that the distressed Brazilian consumer debt he invested in did not (per I.R.C. 166(a)(1)), and could not, become partially worthless within the taxable year the loss was claimed.

m) that his DAD and DAT Tax Shelter investments violated the "sham

partnership doctrine" which disregards purported "partnerships" where the partners do not have a common intention to pursue collectively a joint economic enterprise having economic substance and legitimate business purpose and the "partnership's" purposes are to generate tax losses.

n) that the DAD and DAT Tax Shelter transactions are "listed transactions" and "tax avoidance" devices that are not in accordance with provisions of the Internal Revenue Code and Congressional purpose.

o) that the DAD and DAT Tax Shelter investment were an "abusive tax avoidance" device.

p) that, under I.R.C. 212(2), legal and promoter fees were ot deductible.

q) that his DAD and DAT Tax Shelters investments violated I.R.C. Section 6662(b)(1) that imposes a penalty on taxpayers who are negligent in complying with the provisions of the Internal Revenue Code.

r) that his DAD and DAT Tax Shelter investment violated I.R.C. Section 6662(a) and (b)(2) that imposes a penalty for an underpayment based on a understatement of income tax.

s) that his DAD and DAT Tax Shelter investments violated I.R.C. Section 6662(e)(2) that imposes a penalty on a taxpayer who substantially misstates its tax liability.

t) That Sugarloaf-related loss were not deductible because Plaintiff did not have sufficient investment "at risk".

u) that in 2004 he (Rogers) received notices from the Internal Revenue Service that the use of distressed debt in tax shelter transactions was under investigation.

v) that the Seyfarth Opinion Letter approving the DAD/DAT Tax Shelters was not the independent and neutral work of Seyfarth, because it was prepared by its partner, Rogers, who had an equity interest in each of the entities used to implement the DAD/DAT Tax Shelter transactions.

53.    Weiser did not learn of his injuries until March of 2013.

## HARTIGAN IS LIABLE IN HIS ROLE AS PLAINTIFF'S ATTORNEY AND OUTSIDE HIS ROLE AS AN ATTORNEY

54.    Hartigan served as legal counsel for Weiser through the engagement agreement, see Exhibit A.

55.    Hartigan also injured Weiser outside of his role as an attorney by partnering with Seyfarth and Rogers to develop, market, promote and sell the DAD and DAT Tax Shelters and related LLC and/or trust interest.

22

56.     Throughout the Complaint, Weiser pleads allegations against Hartigan, in the alternative, as to conduct of Hartigan that injured him both inside and outside of the attorney client relationship and role.

## COUNT I

## NON-DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. § 523(a)(2) AGAINST HARTIGAN, INDIVIDUALLY

57.     The allegations set forth hereinabove at Paragraphs 1-56 are incorporated by reference as if fully restated and realleged herein.

58.     Section 523(a)(2)(A) of the Bankruptcy Code provides in relevant part that:

A discharge under . . . this title does not discharge an individual debtor from any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit . . . obtained by . . .false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition.

59.     At all times relevant to the conduct complained of in this Complaint, and, as more fully set forth hereinabove, Hartigan, acting in his non-legal, non-professional capacity as a promoter of the DAD/DAT Tax Shelters, directly and indirectly made numerous knowingly false affirmative misrepresentations and intentional omissions of material fact to Weiser, as set forth hereinabove at Paragraph 51, and incorporated by reference herein.

60.     The above affirmative misrepresentations and/or intentional omissions of material fact were made knowingly by Hartigan with the intent to induce Weiser to enter into the DAD/DAT Tax Shelters and pay substantial fees to Hartigan. In addition, the above intentional omissions of material fact and/or affirmative misrepresentations made by Hartigan were false when made and Hartigan knew these omissions and representations to be false when made with the intention that Weiser rely upon them in entering into the DAD/DAT Tax Shelters and paying substantial fees to Defendants.

61.     In reasonable reliance on Hartigan's false affirmative misrepresentations and intentional omissions of material facts regarding the DAD/DAT Tax Shelters, Weiser paid substantial fees to Hartigan, paid additional amounts to execute the DAD/DAT Tax Shelters, unnecessarily made investments to effectuate the DAD/DAT Tax Shelters, filed federal tax returns using the losses generated from the DAD/DAT Tax Shelters, did not disclose the transactions on their federal tax returns as tax shelters, did not file qualified amended returns, and did not avail himself of other legal tax-reducing opportunities available.

62.     But for Hartigan's intentional misrepresentations and material omissions described above, Weiser would never have paid fees to Hartigan for advice on the DAD/DAT Tax Shelters, engaged in the DAD/DAT Tax Shelters, utilized the DAD/DAT Tax Shelters on his income tax returns, signed and filed his tax returns as prepared in reliance on Hartigan's advice, failed to disclose the DAD/DAT Tax Shelters on his tax returns as tax shelter, failed to file qualified amended returns and/or failed to utilize other legal tax-reducing opportunities. After discovering Hartigan's fraud, Weiser incurred and will continue to incur substantial additional costs to rectify the situation.

63.     As a result of Hartigan's conduct set forth herein, Weiser has suffered injury in that Weiser (1) paid significant fees to Hartigan, (2) unnecessarily made investments to effectuate the DAD/DAT Tax Shelters, (3) has been assessed with back-taxes and substantial penalties and interest by the IRS, (4) lost the opportunity to avail themselves of other legitimate tax-savings opportunities, (5) failed to file qualified amended returns, and (6) has and will continue to incur substantial additional costs to rectify the situation.

64.     As a proximate cause of the foregoing, Weiser has been injured in an actual amount to be proven at trial and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

WHEREFORE, Weiser requests that this Court:

(a)   Determine that Weiser's claims against Hartigan are non-dischargeable under 11 U.S.C. § 523(a)(2)(A) of the Bankruptcy Code;

(b)   Liquidate Weiser's claim and enter a judgment in his favor and against Hartigan in an amount not less than $1,432,500.00 plus the Costs Order, and any and all expenses; and

(c)   Grant such other relief as this Court deems just and appropriate.

## COUNT II

## NON-DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. § 523(a)(4) AGAINST HARTIGAN, AS AN ATTORNEY

65.     The allegations set forth hereinabove at Paragraphs 1-56 are incorporated by reference as if fully restated and realleged herein.

66.     Section 523(a)(4) of the Bankruptcy Code states in relevant part:

A discharge under . . . this title does not discharge an individual debtor from any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

67.     At all times relevant to the conduct complained of in this Complaint, and, as more fully set forth hereinabove, Hartigan, in his fiduciary capacity as Weiser's attorney and as someone that provided financial advice, directly and indirectly made numerous knowingly false affirmative misrepresentations and intentional omissions of material fact to Weiser, as set forth hereinabove at Paragraph 51, and incorporated by reference herein.

68.     The above affirmative misrepresentations and/or intentional omissions of material fact were made knowingly by Hartigan with the intent to induce Weiser to enter into the DAD/DAT Tax Shelters and pay substantial fees to Hartigan. In addition, the above intentional

omissions of material fact and/or affirmative misrepresentations made by Hartigan were false when made and Hartigan knew these omissions and representations to be false when made with the intention that Weiser rely upon them in entering into the DAD/DAT Tax Shelters and paying substantial fees to Hartigan.

69.    In reasonable reliance on Hartigan's false affirmative misrepresentations and intentional omissions of material facts regarding the DAD/DAT Tax Shelters, Weiser paid substantial fees to Hartigan, paid additional amounts to execute the DAD/DAT Tax Shelters, unnecessarily made investments to effectuate the DAD/DAT Tax Shelters, filed federal tax returns using the losses generated from the DAD/DAT Tax Shelters, did not disclose the transactions on his federal tax returns as tax shelters, did not file qualified amended returns, and did not avail himself other legal tax-reducing opportunities available.

70.    But for Hartigan's intentional misrepresentations and material omissions described above, Weiser would never have paid fees to Hartigan for advice on the DAD/DAT Tax Shelters, engaged in the DAD/DAT Tax Shelters, utilized the DAD/DAT Tax Shelters on his income tax returns, signed and filed his tax returns as prepared in reliance on Hartigan's advice, failed to disclose the DAD/DAT Tax Shelters on his tax returns as tax shelter, failed to file qualified amended returns and/or failed to utilize other legal tax-reducing opportunities. After discovering Hartigan's fraud, Weiser incurred and will continue to incur substantial additional costs to rectify the situation.

71.    As a result of Hartigan's conduct set forth herein, Weiser has suffered injury in that Weiser (1) paid significant fees to Hartigan, (2) unnecessarily made investments to effectuate the DAD/DAT Tax Shelters, (3) has been assessed with back-taxes and substantial penalties and interest by the IRS, (4) lost the opportunity to avail themselves of other legitimate

tax-savings opportunities, (5) failed to file qualified amended returns, and (6) has and will continue to incur substantial additional costs to rectify the situation.

72.     As a proximate cause of the foregoing, Weiser has been injured in an actual amount to be proven at trial and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

WHEREFORE, Weiser requests that this Court:

(a)  Determine that Weiser's claims against Hartigan are non-dischargeable under 11 U.S.C. § 523(a)(4) of the Bankruptcy Code;

(b)  Liquidate Weiser's claim and enter a judgment in his favor and against Hartigan in an amount not less than $1,432,500.00 plus the Costs Order, and any and all expenses; and

(c)  Grant such other relief as this Court deems just and appropriate.

## **COUNT III**

## **NON-DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. § 523(a)(6) AGAINST HARTIGAN, INDIVIDUALLY**

73.     The allegations set forth hereinabove at Paragraphs 1-56 are incorporated by reference as if fully restated and realleged herein.

74.     Section 523(a)(6) of the Bankruptcy Code states in relevant part:

A discharge under . . . this title does not discharge an individual debtor from any debt . . . for willful and malicious injury by the Debtor to another entity or to the property of another entity.

75.     Weiser is an "entity" as such term is defined in 11 U.S.C. § 101(15).

76.     Hartigan's conduct, in his non-professional, non legal capacity as a promoter of the DAD/DAT Tax Shelters, as alleged herein constitutes willful and malicious conduct which was intended to, and resulted in, injury to Weiser.

77.     Hartigan wrongfully intended to cause injury and harm to Weiser when he fraudulently and materially misrepresented that:

a.  The DAT Tax Shelter was a legitimate investment that Weiser could expect to profit from;

b.  The Seyfarth Opinion Letters were independent;

c.  There was no fee sharing arrangement between Hartigan, Rogers, and Seyfarth; and

d.  The American Job Creation Act of 2004 had no effect on the legality of the DAT Tax Shelter Scheme.

78.     Hartigan knew or reasonably should have known that the conduct described in Paragraph 77 hereinabove was reasonably certain to cause a specific injury to Weiser.

79.     Weiser has sustained damages as the proximate cause of Hartigan's willful and malicious conduct toward Weiser and his property, in an amount not less than $1,432,500.00, plus costs and expenses.

WHEREFORE, Weiser requests that this Court:

(a)  Determine that Weiser's claims against Hartigan are non-dischargeable under 11 U.S.C. § 523(a)(6) of the Bankruptcy Code;

(b)  Liquidate Weiser's claim and enter a judgment in his favor and against Hartigan in an amount not less than $1,432,500.00 plus the Costs Order, and any and all expenses; and

(c)  Grant such other relief as this Court deems just and appropriate

## COUNT IV

## NON-DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. § 523(a)(6) AGAINST HARTIGAN, AS AN ATTORNEY

80.     The allegations set forth hereinabove at Paragraphs 1-56 are incorporated by reference as if fully restated and realleged herein.

81.     Section 523(a)(6) of the Bankruptcy Code states in relevant part:

A discharge under . . . this title does not discharge an individual debtor from any debt . . . for willful and malicious injury by the Debtor to another entity or to the property of another entity.

82.     Weiser is an "entity" as such term is defined in 11 U.S.C. § 101(15).

83.     Hartigan's conduct, in his fiduciary capacity as Weiser's attorney and as someone that provided financial advice, as alleged herein constitutes willful and malicious conduct which was intended to, and resulted in, injury to Weiser.

84.     Hartigan wrongfully intended to cause injury and harm to Weiser when he fraudulently and materially misrepresented that:

    a.  The DAT Tax Shelter was a legitimate investment that Weiser could expect to profit from;

    b.  The Seyfarth Opinion Letters were independent;

    c.  There was no fee sharing arrangement between Hartigan, Rogers, and Seyfarth; and

    d.  The American Job Creation Act of 2004 had no effect on the legality of the DAT Tax Shelter Scheme.

85.     Hartigan knew or reasonably should have known that the conduct described in Paragraph 84 hereinabove was reasonably certain to cause a specific injury to Weiser.

86.     Weiser has sustained damages as the proximate cause of Hartigan's willful and malicious conduct toward Weiser and his property, in an amount not less than $1,432,500.00, plus costs and expenses.

WHEREFORE, Weiser requests that this Court:

(a)  Determine that Weiser's claims against Hartigan are non-dischargeable under 11 U.S.C. § 523(a)(6) of the Bankruptcy Code;

(b)  Liquidate Weiser's claim and enter a judgment in his favor and against Hartigan in an amount not less than $1,432,500.00 plus the Costs Order, and any and all expenses; and

(c)  Grant such other relief as this Court deems just and appropriate

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on **October 18, 2013**, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF, and that the foregoing document is being

served this day on all counsel of record or pro se parties identified, either via transmission of

Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those

counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

BEHAR, GUTT & GLAZER, P.A.
Attorneys for Plaintiff
2999 N.E. 191st Street, Fifth Floor
Aventura, Florida 33180
Telephone: (305) 931-3771
Fax: (305) 931-3774

By:    /s/**Brian S. Behar**
        BRIAN S. BEHAR
        Florida Bar No. 727131

MINTO LAW GROUP, LLC
Attorneys for Plaintiff
Two Gateway Center
603 Stanwix Street, Suite 2025
Pittsburgh, Pennsylvania 15222
Telephone: (412) 201-5525

ANTHONY J. MADONIA & ASSOCIATES, LTD.
Attorneys for Plaintiff
233 South Wacker Drive, Suite 6825
Chicago, Illinois 60606
Telephone: (312) 578-9300